# Exhibit A-1



## PROCESS SERVER DELIVERY DETAILS

**Date:**                           Thu, Jun 15, 2023
**Server Name:**                    Tina Schroeder

| Entity Served | OPTUMRX, INC. |
|---|---|
| Case Number | 75051/2022 |
| Jurisdiction | OH |

| Inserts | |
|---|---|
| | |



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------------X
CATTARAUGUS COUNTY,

                                                        **Index No.: 75051/2022**

                    Plaintiff,

    v.

                                                        **SUPPLEMENTAL SUMMONS**

PURDUE PHARMA, L.P. et al.,

            Defendants.
------------------------------------------------------------------X

**TO:    THE BELOW NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a notice of

appearance, on the plaintiff's attorney within 20 days after service of this Summons, exclusive of

the day of service, where service is made by delivery upon you personally within the state, or

within 30 days after completion of service where service is made in any other manner.  In case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the Complaint. The basis of the venue is the Defendant's places of business and the

location in which this cause of action arose.

Dated:  April 7, 2023                          Napoli Shkolnik PLLC
        New York, New York                     */s Salvatore C. Badala*
                                               Salvatore C. Badala
                                               Shayna E. Sacks
                                               360 Lexington Avenue
                                               New York, New York 10017
                                               sbadala@napolilaw.com
                                               ssacks@napolilaw.com
                                               Phone: (212) 397-1000

                                               */s Paul J. Napoli*
                                               Paul J. Napoli
                                               Hunter J. Shkolnik
                                               1302 Avenida Ponce de Leon
                                               Santurce, Puerto Rico 00907
                                               hunter@nsprlaw.com
                                               pnapoli@nsprlaw.com
                                               *Attorneys for Plaintiff*

**DEFENDANTS:**

Mylan Pharmaceuticals, Inc.
1000 Mylan Blvd.
Canonsburg, PA 15317

Sandoz, Inc.
100 College Rd.,
West Princeton, NJ 08540

West-Ward Pharmaceuticals Corp. n/k/a Hikma Pharmaceuticals, Inc.
200 Connell Drive, 4th Floor
Berkeley Heights, NJ 07922

Amneal Pharmaceuticals, Inc.
c/o CT Corporation
820 Bear Tavern Road
West Trenton N.J. 08628

KVK-Tech, Inc.
110 Terry Road
Newtown, PA 18940

Indivior Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc.
10710 Midlothian Turnpike, Suite 430
Richmond, VA 23235

 Assertio Therapeutics f/k/a Depomed, Inc.
100 South Saunders Road, Suite 300
Lake Forrest, IL 60045

Abbott Laboratories, Inc.
100 Abbott Park Road
Abbott Park, IL 60064

Sun Pharmaceutical Industries, Inc.
2 Independence Way
Princeton, NJ 08540

Zydus Pharmaceuticals (USA) Inc.
73 NJ-31
Pennington, NJ 08534

Novartis AG a/k/a Novartis Inc. and Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936-1080

Henry Schein, Inc.
135 Duryea Road
Melville, NY 11747

Henry Schein Medical Systems, Inc.
135 Duryea Road
Melville, NY 11747

Koninklijke Ahold Delhaize N.V.
c/o Ahold Delhaize USA, Inc.
1385 Hancock St.
Quincy, MA 02169-5103

Ahold Delhaize USA, Inc.
1385 Hancock St.
Quincy, MA 02169-5103

American Sales Company, LLC
c/o Corporation Service Company
80 State Street
Albany, NY 12207

Associated Pharmacies, Inc.
201 Lonnie E. Crawford Blvd.
Scottsboro, Alabama 35769

Costco Wholesale Corporation
999 Lake Drive
Issaquah, WA 98027

Target Corporation
1000 Nicollet Mall
Minneapolis MN 55403

Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011

Rite Aid of Maryland Inc. d/b/a Mid-Atlantic Customer Support Center
30 Hunter Lane
Camp Hill, PA 17011
c/o CT Corporation System
28 Liberty St
New York, NY 10005

Rite Aid Hdqtrs. Corp.
c/o CT Corporation System
28 Liberty St
New York, NY 10005

Rite Aid of New York, Inc.
c/o CT Corporation System
28 Liberty St
New York, NY 10005

Wegmans Food Markets, Inc.
c/o Corporate Secretary
100 Wegmans Market Street, Legal Dept.,
Rochester, NY 14624

KPH Healthcare Services, Inc. d/b/a Kinney Drugs
c/o agent: The Corporation
29 East Main Street,
 Gouvernor, NY 13642

Kinney Drugs
29 East Main Street
Gouvernor, NY 13642

The Stop & Shop Supermarket Company LLC d/b/a Stop & Shop Pharmacy
c/o Corporation Service Company
80 State Street
Albany, NY 12207

Express Scripts Holding Company
1 Express Way
St. Louis, MO 63121

Express Scripts, Inc.
c/o Corporation Service Company
80 State Street, Albany, NY 12207

UnitedHealth Group Incorporated
c/o CT Corporation System
28 Liberty St.
New York,  NY 10005

Medco Health Solutions, Inc.
c/o The Corporation Trust Company
Corporation trust Center
1209 Orange Street
Wilmington, DE 19801

Merck-Medco
c/o Express Scripts Holding Company
1 Express Way
St. Louis, MO 63121

Optum, Inc.
11000 Optum Circle
Eden Prairie, MN 55344

OptumRx Inc.
c/o CT Corporation System
28 Liberty Street
New York, NY 10005

Navitus Holdings, LLC
c/o CT Corporation System
301 South Bedford St., Suite 1
Madison, WI 53703

Navitus Health Solutions, LLC
c/o CT Corporation System
28 Liberty St.
New York, NY 10005

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF WESTCHESTER

CATTARAUGUS
COUNTY, NY          **,**

Plaintiff,

-against-

**PURDUE PHARMA L.P., et al.,**

Defendants,

**INDEX NO.** 75051/2022

**AMENDED SUPPLEMENTAL SHORT FORM COMPLAINT**

## SHORT FORM COMPLAINT AND JURY DEMAND

Plaintiff incorporates by reference Plaintiff's Master Long Form Complaint, filed on October 6, 2017 and any Short Form Complaints. Pursuant to Order of this Court dated September 28, 2017, the following Short Form Complaint is approved for use in this action.

Plaintiff selects and indicates by checking off the appropriate spaces those claims that are specific to its case in this supplemental pleading. Where certain claims require specific pleadings or case-specific facts and individual information, Plaintiff shall add and include them herein.

1.      Plaintiff  Cattaraugus County          , New York states and brings this civil action before the Supreme Court for the State of New York, County of Westchester as a coordinated action in the *In Re Opioid Litigation.* Plaintiff is filing this Short Form Complaint as permitted and approved by Order of Honorable Jerry Garguilo, dated September 28, 2017, and adopts and incorporates by reference those allegations in the Plaintiff's Master Long Form Complaint, any Short Form Complaints, and any and all amendments thereto.

2.      Venue is proper pursuant to the New York Litigation Coordinating Panel. (*See* Dkt. No. 1.)

3.      Plaintiff is a New York municipality and claims injuries and damages as set forth in the in the Master Long Form Complaint, any Short Form Complaints, and below.

1

4.    This Amended Supplemental Addendum supplies allegations only with respect to new

Defendants not identified in the Master Long-Form Complaint and Short Form Complaints.

## SUPPLEMENTAL DEFENDANTS AND CAUSES OF ACTION

5.    Plaintiff defines "Defendants" as collectively including the Defendants selected in the

following subcategories identified as "Manufacturer Defendants," Distributor Defendants", and

"Individual Defendants."

    a.    Plaintiff defines the subcategory "Manufacturer Defendants" as including the following

        (check all that apply):

☐ Purdue Pharma L.P.

☐ Purdue Pharma Inc.

☐ The Purdue Frederick Company, Inc.

☐ Teva Pharmaceuticals USA, Inc.

☐ Cephalon, Inc.

☐ Johnson & Johnson

☐ Janssen Pharmaceuticals, Inc.

☐ Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.

☐ Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.

☐ Endo Health Solutions Inc.

☐ Endo Pharmaceuticals, Inc.

☐ Allergan plc f/k/a Actavis plc

☐ Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.

☐ Watson Laboratories, Inc.

☐ Actavis LLC

☐ Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

2

☐ Insys Therapeutics, Inc.

✓ Other: See Addendum

      b.  Plaintiff defines the subcategory "Distributor Defendants" as including the following

      (check all that apply):

☐ McKesson Corporation

☐ Cardinal Health Inc.

☐ Amerisource Drug Corporation

☐ American Medical Distributors, Inc.

☐ Bellco Drug Corp.

☐ Blenheim Pharmacal, Inc.

☐ Darby Group Companies, Inc.

☐ Eveready Wholesale Drugs Ltd.

☐ Kinray, LLC

☐ PSS World Medical, Inc.

☐ Rochester Drug Cooperative, Inc.

✓ Other: See Addendum

      c.  Plaintiff defines the subcategory "Individual Defendants" as including the following

      (check all that apply):

☐ Russell Portenoy

☐ Perry Fine

☐ Scott Fishman

☐ Lynn Webster

✓ Other: See Addendum

3

6.      The following causes of actions are asserted by Plaintiff in its Master Long Form

Complaint and are herein adopted by reference (check all that apply):

☑   **FIRST CAUSE OF ACTION – DECEPTIVE ACTS AND PRACTICES NEW YORK GENERAL BUSINESS LAW §349 against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other:   See Addendum

☑   **SECOND CAUSE OF ACTION – FALSE ADVERTISING NEW YORK GENERAL BUSINESS LAW §350 against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other: See Addendum

☑   **THIRD CAUSE OF ACTION – PUBLIC NUISANCE against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other:   See Addendum

☑   **FOURTH CAUSE OF ACTION – VIOLATION OF NEW YORK SOCIAL SERVICES LAW §145-b against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other:   See Addendum

4

☑ **FIFTH CAUSE OF ACTION – FRAUD against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other:  See Addendum

☑ **SIXTH CAUSE OF ACTION – UNJUST ENRICHMENT against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other: See Addendum

☑ **SEVENTH CAUSE OF ACTION – NEGLIGENCE against:**

☐ Manufacturer Defendants

☐ Individual Defendants

☐ Distributor Defendants

☑ Other:  See Addendum

5

FILED: WESTCHESTER COUNTY CLERK 04/07/2023 11:20 AM
NYSCEF DOC. NO.

INDEX NO. 75051/202

RECEIVED NYSCEF: 04/07/202

Case 7:23-cv-06103-CS  Document 1-1  Filed 07/15/23  Page 13 of 41

Plaintiff asserts the following additional causes of action, case-specific pleadings, case-specific facts,

and/or Defendants *[attach additional pages as necessary]*:

See Addendum

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants, jointly and severally, as to

the Causes of Action specifically referenced in paragraph 5 herein, awarding Plaintiff in amounts that

exceed the jurisdiction of all lower Courts:

     i.     compensatory damages in an amount sufficient to fairly and completely compensate

           Plaintiff for all damages;

     ii.    treble damages, penalties, and costs pursuant to Social Services Law §145-b;

     iii.   treble damages, penalties and costs pursuant to General Business Law §§349(h) and

           350-3(3);

     iv.   punitive damages;

     v.    attorneys' fees

     vi.   interest, costs and disbursements;

     vii.  such and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:  April 7, 2023              Respectfully submitted,

                                   **Napoli Shkolnik**

                                   **/s Paul J. Napoli**
                                   **Paul J. Napoli**
                                   **Hunter J. Shkolnik**
                                   **1302 Avenida Ponce de Leon**
                                   **Santurce, Puerto Rico 00907**
                                   **pnapoli@nsprlaw.com**
                                   **hunter@nsprlaw.com**

                                   **/s Salvatore C. Badala**
                                   **Salvatore C. Badala**
                                   **Shayna E. Sacks**
                                   **360 Lexington Avenue**
                                   **New York, New York 10017**
                                   **sbadala@napolilaw.com**
                                   **ssacks@napolilaw.com**
                                   **Phone: (212) 397-1000**

7

1.      Plaintiff Cattaraugus County, NY submits its Amended Supplemental Short Form Complaint - Amended, including this addendum, to add new defendants and to provide factual allegations supporting the addition of these new defendants.

2.      The new defendants added through this  Amended Supplemental Short Form Complaint fall into four categories: (a) additional manufacturers of prescription opioids who engaged in the fraudulent marketing conduct described in the Master Long Form Complaint and/or failed to detect suspicious orders and prevent diversion of opioids to and within Plaintiff's geographic area; (b)  additional wholesale distributors of prescription opioids who engaged in the conduct of the Distributors named in the Master Long-Form Complaint and Short Form Complaints; (c) additional retail distributors and dispensers of prescription opioids who, as set forth below, failed to detect suspicious orders and prevent diversion of opioids to and within Plaintiff's geographic area and engaged in the conduct of the Pharmacy Defendants named in the Master Long-Form Complaint and Short Form Complaints; and (d) pharmacy benefit managers who, as set forth below, fueled the opioid epidemic.

3.      This Amended Supplemental Addendum supplies allegations only with respect to new defendants not identified in the Master Long-Form Complaint and Short Form Complaints.

4.      Plaintiff by and through its attorneys, bring this amended supplemental action against Defendants Mylan Pharmaceuticals, Inc.; Sandoz, Inc.; West-Ward Pharmaceuticals Corp. n/k/a Hikma Pharmaceuticals, Inc.; Amneal Pharmaceuticals, Inc.; KVK-Tech, Inc.; Indivior Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc.; Assertio Therapeutics f/k/a Depomed, Inc.; Abbott Laboratories, Inc. Sun Pharmaceutical Industries, Inc.; Zydus Pharmaceuticals (USA) Inc.; Novartis AG a/k/a Novartis Inc. and Novartis Pharmaceuticals Corporation (Collectively, "Manufacturers," "Manufacturer Defendants," or "Defendants"); Henry Schein, Inc.; Henry Schein Medical Systems, Inc.; Koninklijke Ahold Delhaize N.V.; Ahold Delhaize USA, Inc.; American

1

Sales Company, LLC; (Collectively, "Distributors," "Distributor Defendants," or "Defendants");

Associated Pharmacies, Inc.; Costco Wholesale Corporation; Target Corporation; Rite Aid

Corporation; Rite Aid of Maryland Inc. d/b/a Mid-Atlantic Customer Support Center; Rite Aid

Hdqtrs. Corp.; Rite Aid of New York, Inc.; Wegmans Food Markets, Inc.; KPH Healthcare

Services, Inc. d/b/a Kinney Drugs; Kinney Drugs; The Stop & Shop Supermarket Company LLC

d/b/a Stop & Shop Pharmacy (Collectively, "Distributors," or "Pharmacies," or "Defendants");

Express Scripts Holding Company; Express Scripts, Inc.; UnitedHealth Group Incorporated;

Medco Health Solutions, Inc.; Merck-Medco; Optum, Inc.; Optum, Inc.; OptumRx Inc.; Navitus

Holdings, LLC; Navitus Health Solutions, LLC (collectively, "PBM Defendants" or

"Defendants"); (Collectively, "Defendants") allege as follows:

## INTRODUCTION

5.      This case is about one thing: corporate greed. Defendants put their desire for profits

above the health and well-being of consumers in Plaintiff's geographic area at the cost of Plaintiff.

6.      Plaintiff spends millions of dollars each year to provide and pay for health care,

services, pharmaceutical care and other necessary services and programs on behalf of residents

who are indigent or otherwise eligible for services, including payments through services such as

Medicaid for prescription opium painkillers ("opioids") which are manufactured, marketed,

promoted, sold, distributed, processed, and/or dispensed by the Defendants.

7.      Plaintiff also provides a wide range of other services to its residents, including law

enforcement, services for families and children, and public assistance.

8.      In recent years, Plaintiff has been forced to expend exorbitant amounts of money,

described further below, due to what is commonly referred to as the "opioid epidemic" and as a

direct result of the actions of Defendants.

2

9.      Plaintiff is also responsible for either partially or fully funding a medical insurance plan for their employees, including the costs of prescription drugs, including opioids.

10.     Addiction is a spectrum of substance use disorders that range from misuse and abuse of drugs to addiction.[1] Throughout this Complaint, "addiction" refers to the entire range of substance abuse disorders. Individuals suffer negative consequences wherever they fall on the substance use disorder spectrum.

11.     Defendants knew that opioids were effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care. Yet they also knew–and had known for years–that opioids were addictive and subject to abuse, particularly when used long-term for chronic non-cancer pain (pain lasting three months or longer, hereinafter referred to as "chronic pain"), and should there not be used except as a last-resort.

12.     Defendants knew that, barring exceptional circumstances, opioids were too addictive and too debilitating for long-term use for chronic non-cancer pain lasting three months or longer.

13.     Defendants further knew–and had known for years–that with prolonged use, the effectiveness of opioids wanes, requiring increases in doses and markedly increasing the risk of significant side effects and addiction.[2, 3]

14.     Defendants also knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*, hospitals), where the risk of addiction and other adverse outcomes was much less significant.

---

[1] Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V").

[2] *See, e.g.*, Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt. 247 (1994).

[3] The authoritative *Diagnostic and Statistical Manual of Mental Disorders*, (5th ed. 2013) ("DSM-V") classifies addiction as a spectrum of "substance use disorders" that ranges from misuse and abuse of drugs to addiction. Patients suffer negative consequences wherever they fall on the substance use disorder continuum. Throughout this Complaint, "addiction" refers to this range of substance use disorders.

3

15.     Indeed, the U.S. Food and Drug Administration ("FDA") has expressly recognized that there have been no long-term studies demonstrating the safety and efficacy of opioids for long-term use.[4]

16.     Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, and generics like oxycodone and hydrocodone, are narcotics. They are derived from or possess properties similar to opium and heroin, which is why they are regulated as controlled substances.[5] Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain. Opioids also can create a euphoric high, which can make them addictive. At certain doses, opioids can slow the user's breathing, causing respiratory depression and death.

17.     In order to expand the market for opioids and realize blockbuster profits, Defendants needed to create a sea of change in the medical and public perception that would permit the use of opioids not just for acute and palliative care, but also for long periods of time to treat more common aches and pains, like lower back pain, arthritis, and headaches.

---

[4] Letter from Janet Woodcock, M.D., Dir., Ctr. for Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[5] Since passage of the Controlled Substances Act ("CSA") in 1970, opioids have been regulated as controlled substances. Controlled substances are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the highest. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs. Schedule II drugs have a high potential for abuse, have a currently accepted medical use, and may lead to severe psychological or physical dependence. 21 U.S.C. § 812. Schedule II drugs may not be dispensed without an original copy of a manually signed prescription from a doctor, which may not be refilled, and filled by a pharmacist who both must be licensed by their state and registered with the DEA. 21 U.S.C. § 829. Opioids that have been categorized as Schedule II drugs include morphine (Avinza, Embeda, Kadian, MS Contin), fentanyl (Duragesic, Actiq, Fentora), methadone, oxycodone (OxyContin, Percocet, Percodan, Tylox), oxymorphone (Opana), and hydromorphone (Dilaudid, Palladone). Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812. Schedule III drugs may not be dispensed without a written or oral prescription, which may not be filled or refilled more than six months after the date of the prescription or be refilled more than five times. 21 U.S.C. § 829. Some opioids had been categorized as Schedule III drugs, including forms of hydrocodone and codeine combined with other drugs, like acetaminophen. However, in October 2013, the FDA, following the recommendation of its advisory panel, reclassified all medications that contain hydrocodone from Schedule III to Schedule II. *See* 21 C.F.R. § 1308.

4

18. Defendants, through a sophisticated and highly deceptive and unfair marketing campaign that began in the late 1990s, deepened around 2006, and continues to the present, set out to, and did, reverse the popular and medical understanding of opioids. Chronic opioid therapy—the prescribing of opioids to treat chronic pain long-term—is now commonplace.

19. To accomplish this reversal, Defendants spent hundreds of millions of dollars: (a) developing and disseminating seemingly truthful scientific and educational materials and advertising that misrepresented the risks, benefits, and superiority of opioids long-term use to treat chronic pain (b) deploying sales representatives who visited doctors and other prescribers and delivered misleading messages about the use of opioids (c) recruiting prescribing physicians as paid speakers as a means to secure those physicians' future "brand loyalty" and extend their reach to all physicians; (d) funding, assisting, encouraging, and directing certain doctors, known as "key opinion leaders" ("KOLs"), not only to deliver scripted talks, but also to draft misleading studies, present continuing medical education programs ("CMEs") that were deceptive and lacked balance, and serve on the boards and committees of professional societies and patient advocacy groups that delivered messages and developed guidelines supporting chronic opioid therapy; and (e) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups") that developed educational materials and treatment guidelines that were then distributed by Defendants, which urged doctors to prescribe, and patients to use, opioids long-term to treat chronic pain.

20. These efforts, executed, developed, supported, and directed by Defendants, were designed not to present a fair view of how and when opioids could be safely and effectively used, but rather to convince doctors, patients and others that the benefits of using opioids to treat chronic pain outweighed the risks and that opioids could be used safely by most patients. Defendants and the third parties whom they recruited and supported, all profited handsomely through their

5

dissemination of the deceptive information. KOLs and Front Groups saw their stature in the medical community elevated dramatically due to Defendants' funding, and Defendants saw an equally dramatic rise in their revenues.

21. Working individually, with, and through these Front Groups and KOLs, Defendants pioneered a new and far broader market for their potent and highly addictive drugs— the chronic pain market. Defendants persuaded doctors, patients and others that what they had long understood—that opioids are addictive drugs and unsafe in most circumstances for long-term use— was untrue, and to the contrary, that the compassionate treatment of pain *required* opioids. Ignoring the limitations and cautions in their own drugs' labels, Defendants: (a) overstated the benefits of chronic opioid therapy, promised improvement in patients' function and quality of life, and failed to disclose the lack of evidence supporting long-term use; (b) trivialized or obscured their serious risks and adverse outcomes, including the risk of addiction, overdose, and death; (c) overstated their superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives; and (d) mischaracterized the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms. There was, and is, no reliable scientific evidence to support Defendants' marketing claims, and there was, and is, a wealth of scientific evidence that these claims are simply false. Defendants also deceptively and unfairly marketed the drugs for indications and benefits that were outside of the drugs' labels and not supported by substantial evidence.

22. Even Defendants' KOLs initially were very cautious about whether opioids were appropriate to treat chronic pain. Some of these same KOLs have since recanted their pro-opioid marketing messages and acknowledged that Defendants' marketing went too far. Yet despite the voices of renowned pain specialists, researchers, and physicians who have sounded the alarm on

6

the overprescribing of opioids to treat chronic pain, Defendants continue to disseminate their misleading and unfair marketing claims to this day.

23. Defendants' efforts were wildly successful in expanding opioid abuse. The United States is now awash in opioids. In 2012, health care providers wrote 259 million prescriptions for opioid painkillers— enough to medicate every adult in America around the clock for a month. Twenty percent of all doctors' visits in 2010 resulted in the prescription of an opioid, nearly double the rate in 2000. Opioids—once a niche drug—are now the most prescribed class of drugs—more than blood pressure, cholesterol, or anxiety drugs. While Americans represent only 4.6% of the world's population, they consume 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.

24. Together, opioids generated $8 billion in revenue for drug companies in 2012. Of that amount, $3.1 billion went to Purdue for its OxyContin sales. By 2015, sales of opioids grew further to approximately $9.6 billion.[6]

25. It was Defendants' marketing—and not any medical breakthrough—that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse. The result has been catastrophic.

26. Indeed, the National Institutes of Health "NIH" not only recognizes the opioid abuse problem, but also identifies Defendants' "aggressive marketing" as a major cause: "Several factors are likely to have contributed to the severity of the current prescription drug abuse problem. They include drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and *aggressive marketing by*

---

[6] D. Crow, *Drugmakers hooked on $10bn opioid habit*, Financial Times (August 10, 2016).

*pharmaceutical companies*." [7] As shown herein, the "drastic increases in the number of prescriptions written and dispensed" and the "greater social acceptability for using medications for different purposes" are not really independent causative factors but are in fact the direct result of "the aggressive marketing by pharmaceutical companies."

27.     According to the U.S. Centers for Disease Control and Prevention ("CDC"), the nation has been swept up in an opioid-induced "public health epidemic."[8] According to the CDC, prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012.

28.     From 1999 through 2016, more than 350,000 people died from an overdose involving any opioids. Well over half of those deaths—over 200,000 people—involved opioids prescribed by doctors to treat pain. These opioids include brand-name prescription medications like OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

29.     Plaintiff and the State of New York have taken steps and will foreseeably continue to take steps in efforts to combat the opioid epidemic which has been caused by the actions of the Defendants. These government efforts create an increased cost and spending.

30.     Due to the continued rise of the opioid epidemic and deaths, Plaintiff has taken steps and will continue to take steps to fight the use of opioids and save lives.

31.     The commission of criminal acts to obtain opioids is an inevitable consequence of opioid addiction.

---

[7] America's Addiction to Opioids: Heroin and Prescription Drug Abuse. Available at
http://www.drugabuse.gov/about-nida/legislative-activities/testimony-to-congress/2015/americas-addiction-to-opioids-heroin-prescription-drug-abuse#_ftn2 (accessed August 18, 2017) (emphasis added).
[8] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr. 29, 2014),
http://www.cdc.gov/washington/testimony/2014/t20140429.htm (accessed May 30, 2017).

8

32.     But even these alarming statistics do not fully communicate the toll of prescription opioid abuse on patients and their families.

33.     The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors. When turned down by one physician, many of these addicts deploy increasingly desperate tactics—including doctor-shopping, use of aliases, and criminal means—to satisfy their cravings.

34.     Efforts by doctors to reverse course for a chronic pain patient already on opioids long-term include managing the physical suffering and psychological distress a patient endures while withdrawing from the drugs. This process is often thwarted by a secondary criminal market well-stocked by a pipeline of drugs that is diverted to supply them. Even though they never would have prescribed opioids in the first place, many doctors feel compelled to continue prescribing opioids to patients who have become dependent on them.

35.     According to the CDC, more than 12 million Americans age 12 or older have used prescription painkillers without a prescription in 2010, and adolescents are abusing opioids in alarming numbers.[9]

36.     Opioid abuse has not displaced heroin, but rather triggered a resurgence in its use, imposing additional burdens on Plaintiff and local agencies that address heroin use and addiction. According to the CDC, the percentage of heroin users who also use opioid pain relievers rose from 20.7% in 2002-2004 to 45.2% in 2011-2013. Heroin produces a very similar high to prescription opioids but is often cheaper. While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price. It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person who started on prescription opioids for a

---

[9] CDC, *Prescription Painkiller Overdoses in the US* (Nov. 2011),
https://www.cdc.gov/vitalsigns/painkilleroverdoses/ (accessed May 30, 2017).

9

back injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

37. Dr. Robert DuPont, former director of the National Institute on Drug Abuse, opines that opioids are more destructive than crack cocaine:

> [Opioid abuse] is building more slowly, but it's much larger. And the potential for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem.[10]

38. Countless Plaintiff's residents suffer from chronic pain, which takes an enormous toll on their health, their lives, and their families. These residents deserve both appropriate care and the ability to make decisions based on accurate and complete information about treatment risks and benefits. But Defendants' deceptive and unfair marketing practices deprived City residents and their doctors of the ability to make informed medical decisions and, instead, caused important, sometimes life-or-death decisions to be made based not on science, but on hype. Defendants deprived patients, their doctors, and health care payors of the chance to exercise informed judgment and subjected them to enormous costs and suffering.

39. Defendants' actions are not permitted or excused by the fact that their labels may have allowed, or did not exclude, the use of opioids for chronic non-cancer pain. The FDA's approval did not give Defendants license to misrepresent the risks, benefits, or superiority of

---

[10] Transcript, *Use and Abuse of Prescription Painkillers*, The Diane Rehm Show (Apr. 21, 2011), http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript (accessed May 30, 2017).

10

opioids. Indeed, what makes Defendants' efforts particularly nefarious—and dangerous—is that, unlike other prescription drugs marketed unlawfully in the past, opioids are highly addictive controlled substances. Defendants deceptively and unfairly engaged a patient base that—physically and psychologically—could not turn away from their drugs, many of whom were not helped by the drugs or were profoundly damaged by them.

40.     Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were both ubiquitous and highly persuasive; their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants targeted not only pain specialists, but also primary care physicians (PCPs), nurse practitioners, physician assistants, and other non-pain specialists who were even less likely to be able to assess the companies' misleading statements. Defendants were also able to callously manipulate what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

41.     By 2014, nearly two million Americans were either abusing opioid medications or were dependent on opioids.[11] According to the CDC, opioids have created a "public health epidemic" as of 2016.[12]

42.     Defendants' marketing campaign has been extremely harmful and has cost American lives – including lives of residents of Plaintiff. Deaths from prescription opioids have quadrupled since 1999. From 2000 to 2014 nearly 500,000 people died from such overdoses; seventy-eight Americans die every day from opioid overdoses.[13]

---

[11] CDC, Injury Prevention & Control: Opioid Overdose, Prescription Opioids, Addiction and Overdose. Available at http://www.cdc.gov/drugoverdose/opioids/prescribed.html (accessed May 30, 2017).
[12] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, (Apr. 29, 2014), http://www.cdc.gov/washington/testimony/2014/ts0140429.htm (accessed May 30, 2017).
[13] CDC, Injury Prevention & Control: Opioid Overdose, Understanding the Epidemic.

11

43.     It is estimated that, in 2012, 2.1 million people in the United States suffered from substance use disorders related to prescription opioid pain relievers.[14]

44.     The rising numbers of persons addicted to opioids have led not only to an increase in health care costs to Plaintiff, but also a major increase in issues such as drug abuse, diversion,[15] and crimes related to obtaining opioid medications. Plaintiff has been severely and negatively impacted due to the fraudulent misrepresentations and omissions by Defendants regarding the use and risk related to opioids. In fact, upon information and belief, Defendants have been and continue to be aware of the high levels of diversion of their product.

45.     The actions of Defendants have created an environment where select physicians have sought to profit at the expense of their patients who become addicted to opioid pain medications, often accepting cash payments and ordering unnecessary medical tests, again at the expense of Plaintiff.

46.     Prescription drug manufacturers, wholesalers/distributors, pharmacies, and pharmacy benefit managers ("PBMs") have created this epidemic. The manufacturers make the opioids and lie about their efficacy and addictive properties. The wholesalers distribute the opioids from the point of manufacture to the point of delivery to the patient. The pharmacies distribute and dispense opioids. And the PBMs control, through their formularies, which drugs go where and how they are paid for.

47.     PBMs are a necessary party to any discussion of opioid-related misconduct committed by pharmaceutical supply chain actors, and its ramifications. Neither courts nor the governmental entities left to clean up the opioid crisis can address the flow of opioids or the costs

---

[14] Substance Abuse and Mental Health Services Administration, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings*, NSDUH Series H- 46, HHS Publication No. (SMA) 13-4795. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2013.
[15] The CDC defines using or obtaining opioids illegally as "diversion."

12

of abatement without including the parties that are in fact capable of controlling that flow, across all manufacturers and distributors, i.e. the PBMs.

48.     PBMs are the gatekeepers to the vast majority of opioid prescriptions filled in the United States. Express Scripts and OptumRx (named defendants here) manage the drug benefits for approximately ninety-five percent (95%) of the United States' population or 253 million American lives. [16] PBMs control drug formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed. In this way, PBMs control prescription drug utilization overall.

49.     PBMs' complicity in the overall fraudulent scheme is purposeful given the nature of the financial arrangements between PBMs and drug manufacturers and others in the supply chain. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements that would slow down flow.

50.     PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies. These incentives include the payment of rebates by Manufacturers Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

51.     PBMs are the middlemen between the manufacture and the availability of opioids. The PBM formularies determine what drugs (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what

---

[16] Brittany Hoffman-Eubanks, The Role of Pharmacy Benefit Managers in American Health Care: Pharmacy Concerns and Perspectives: Part 1, PHARMACY TIMES, Nov. 14, 2017, http://www.pharmacytimes.com/news/the-role-ofpharmacy-benefit-mangers-in-american-health-care-pharmacy-concerns-and-perspectives-part-1

13

level of authorization will be required; and (f) what beneficial drugs will not be available. PBMs collude with Manufacturers who pay fees in the form of rebates, administrative fees and other, in order to ensure good placement on the formulary to the financial benefit of the PBMs. This leads to more prescriptions and more pills available to the general public, many of which find their way to the black market. PBMs have in their exclusive power the ability to limit the number of pills available for legitimate and illegitimate consumption. Even though PBMs were well aware of the effect of their decisions about formulary placement, they chose to make decisions purely for their own financial gain.

52.     PBMs not only control the majority of this country's prescriptions through their formularies, they generate massive profits from that work. "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And most of these rebates directly benefited the PBM."[17]

53.     PBMs can extract rebates and other incentives from Manufacturer Defendants because of the PBMs' market power. Today, PBMs have leveraged their position as the middlemen and now impact almost every aspect of the prescription drug marketplace.

54.     "The position of the three major PBMs at the center of the drug distribution system appears to be unassailable for now. Last year CalPERS, California's public employee benefits system, awarded OptumRx a five-year, $4.9-billion contract to manage prescriptions for nearly 500,000 members and their families enrolled in non-HMO health plans. The only other finalists in the bidding were CVS Caremark and Express Scripts,"[18] all Defendants here.

---

[17] Wayne Winegarden, To Improve Pharmaceutical Pricing, Reform PBMs And Fix Health Care's Systemic Problems, FORBES, Apr. 4, 2017, https://www.forbes.com/sites/econostats/2017/04/04/to-improve-pharmaceutical-pricingreform-pbms-and-fix-health-cares-systemic-problems/#4da58c5a3322

[18] Michael Hiltzik, How 'price cutting' middlemen are making crucial drugs vastly more expensive, LOS ANGELES TIMES, Jun. 9, 2017, http://www.latimes.com/business/hiltzik/la-fi-hiltzik-pbm-drugs-20170611-story.html

14

55.     The power of the PBMs has evolved over time. Originally mere claims processors, PBMs now play a major role in managing pharmaceutical spending and enhancing health benefits for end-users.[19]

56.     PBMs quietly became an integral part of the pharmaceutical supply chain—that is, the path a drug takes from the manufacturing facility to a bathroom medicine cabinet—following the passage of the Medicare Modernization Act in 2003.[20]

57.     Because PBMs are the intermediary between drug manufacturers, pharmacies, and ultimately patients, these companies control everything from pharmacy reimbursements to what drugs are covered under formularies.[21] In these ways, the PBMs control which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

58.     The harm caused by the PBMs is not just monetary: "[t]he PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[22]

59.     MedPageToday, a source for clinical and policy coverage that directly affects the lives and practices of health care professionals, describes the PBMs' complicity in the opioid crisis this way:

> If you are looking for someone to blame for the opioid epidemic, you can certainly blame physicians. You can blame pharmaceutical companies. But while you are at it, don't forget to include payers [PBMs]. This conclusion should not be surprising. We live in a world

---

[19] Zacks Equity Research, PBM Industry Shows Strength: 3 Stocks in Focus, NASDAQ, Dec. 13, 2017, http://www.nasdaq.com/article/pbm-industry-shows-strength-3-stocks-in-focus-cm891506

[20] Jessica Wapner, Understanding the Hidden Villain of Big Pharma: Pharmacy Benefit Managers, NEWSWEEK, Mar. 17. 2017, http://www.newsweek.com/big-pharma-villain-pbm-569980

[21] Matthew Kandrach, PBM stranglehold on prescription drug market demands reform, THE HILL, May 2, 2017, http://thehill.com/blogs/pundits-blog/healthcare/331601-pbm-stranglehold-on-prescription-drug-market-demandsreform

[22] Jonathan Wilcox, PBMs Must Put Patients First, HUFFINGTON POST, Feb. 28, 2017, https://www.huffingtonpost.com/entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc

15

where payers -- not physicians -- determine what drugs and treatments patients receive. If patients have a life-threatening condition, it is not unusual for a payer to demand that a physician first prescribe a cheaper and less effective alternative. Physicians know that the drugs they are allowed to use may not work very well, but frequently, payers demand that they be tried first anyway.

What happens if the patient doesn't respond to the cheap drug? Often, the physician continues to prescribe it, because -- to gain access to the more effective drug -- physicians need to go through a painful process of preauthorization. For many practitioners, it isn't worth it. So we spend more for healthcare than any other country in the world, but Americans do not get the care they need. There is a simple reason. Treatment decisions are not being driven based on a physician's knowledge or judgment. They are being driven by what payers are willing to pay for.[23]

60.     As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."[24]

61.     As a direct and foreseeable consequence of Defendants' wrongful conduct, Plaintiff has each been required to spend millions of dollars each year in its efforts to combat the public nuisance created by Defendants' deceptive marketing campaign. Plaintiff has incurred and continue to incur costs related to opioid addiction and abuse, including, but not limited to, health care costs, criminal justice and victimization costs, social costs, and lost productivity costs. Defendants' misrepresentations regarding the safety and efficacy of long-term opioid use proximately caused injury to Plaintiff and their residents.

---

[23] Milton Packer MD, Are Payers the Leading Cause of Death in the United States?, MEDPAGETODAY, Nov. 1, 2017, https://www.medpagetoday.com/blogs/revolutionandrevelation/68935
[24] Peter J. Pitts, Pharmacy benefit managers are driving the opioid epidemic, SW NEWS MEDIA, Nov. 21, 2017, http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managersare-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-, 61d29d25c84b.html

16

62.     Defendants have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis and perpetuate the public nuisance.

63.     Plaintiff brings this suit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.

## JURISDICTION AND VENUE

64.     This Court has jurisdiction over this action pursuant to New York Constitution article VI, Section 7(a) and CPLR 301 and 302.

65.     Venue is proper in pursuant to the New York Litigation Coordinating Panel.

66.     This action is non-removable because there is incomplete diversity of residents and no substantial federal question is presented.

## PARTIES

### A.  Plaintiff.

67.     Plaintiff Cattaraugus County, NY is a county within the State of New York, with a population of approximately 76,426 residents.

68.     Plaintiff provides a wide range of services on behalf of their residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

### B.  Defendants.[25]

#### 1.  Mylan

69.     Defendant Mylan Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business located in Canonsburg, Pennsylvania. It manufactures, promotes,

---

[25] Plaintiff has made its best efforts, based on the information available, to identify all of the corporate entities with responsibilities related to the sale and distribution of opioids in or affecting Plaintiff. If information that becomes available to Plaintiff alters its understanding or discloses additional entities, Plaintiff reserve the right to seek to join any such entities as defendants. Furthermore, the County recognizes that corporate entities affiliated with the Defendants may possess discoverable information relevant to Plaintiff's claims, even though those entities have not been named as defendants. Plaintiff reserve the right to seek all information relevant to these claims.

17

markets, distributes and sells opioids in Plaintiff's geographical area and throughout the nation. This includes many Schedule II controlled substances such as Oxycodone and Propoxy-N. Mylan conducts its pharmaceutical business operations through various entities, including Mylan Specialty, L.P. and Mylan Pharms, Inc. (collectively "Mylan".) At all relevant times, Mylan manufactured, marketed, and sold generic opioids, including fentanyl and oxycodone products, throughout the United States and Plaintiff's geographic area. Mylan manufactured, marketed, and sold opioids throughout Plaintiff's geographic area, in violation of the duties owed to Plaintiff, in sufficient quantities to be a proximate cause of Plaintiff's injuries.

70.     As a generic manufacturer, Mylan failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users. Mylan could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Mylan had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Mylan failed to report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur. See 21 C.F.R. § 1301.71(a).

**2. Sandoz**

71.     Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business located in Princeton, New Jersey. Sandoz, Inc. is a subsidiary of Defendant Novartis AG.

72.     Sandoz manufactures, promotes, markets, distributes and sells opioids in Plaintiff's geographical area and throughout the nation. At all times relevant, Sandoz, Inc. manufactured, marketed, and sold opioids, including fentanyl and oxycodone products, throughout the United States and Plaintiff's geographic area. Sandoz manufactured, marketed, and sold opioids

18

throughout Plaintiff's geographic area, in violation of the duties owed to Plaintiff in sufficient quantities to be a proximate cause of Plaintiff's injuries.

73. As a generic manufacturer, Sandoz failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users. Sandoz could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Sandoz had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Sandoz failed to report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur. See 21 C.F.R. § 1301.71(a).

### 3. Novartis

74. Defendant Novartis AG a/k/a Novartis Inc. and Novartis Pharmaceuticals Corporation (collectively "Novartis") is a Delaware corporation and is located at One Health Plaza, East Hanover, New Jersey, 07936-1080.

75. Novartis manufactures, promotes, markets, distributes and sells opioids in Plaintiff's geographical area and throughout the nation. At all times relevant, Novartis manufactured, marketed, and sold opioids, including fentanyl and oxycodone products, throughout the United States and Plaintiff's geographic area. Novartis manufactured, marketed, and sold opioids throughout Plaintiff's geographic area, in violation of the duties owed to Plaintiff in sufficient quantities to be a proximate cause of Plaintiff's injuries.

76. As a generic manufacturer, Novartis failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users Novartis could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or

19

healthcare provider letters. However, Novartis had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Novartis failed to report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur. See 21 C.F.R. § 1301.71(a).

### 4. **West-Ward n/k/a Hikma Pharmaceuticals**

77. Defendant West-Ward Pharmaceuticals Corp. n/k/a Hikma Pharmaceuticals, Inc. ("Hikma") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. It manufactures, promotes, markets, distributes and sells opioids in in Plaintiff's geographical area and throughout the nation. At all times relevant, Hikma manufactured, marketed, and sold opioids, including hydromorphone, oxymorphone, and methadone products, throughout the United States and Plaintiff's geographic area. Hikma manufactured, marketed, and sold opioids throughout Plaintiff's geographic area, in violation of the duties owed to Plaintiff in sufficient quantities to be a proximate cause of Plaintiff's injuries.

78. As a generic manufacturer, Hikma failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users. Hikma could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Hikma had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Hikma failed to

20

report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur. See 21 C.F.R. § 1301.71(a).

**5. Amneal**

79.     Defendant Amneal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located in New Jersey. Upon information and belief, Amneal Pharmaceuticals, Inc. is a subsidiary of Amneal Pharmaceuticals LLC.

80.     Defendant Amneal Pharmaceuticals, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.

81.     Defendant Amneal Pharmaceuticals, Inc. and Defendant Amneal Pharmaceuticals, LLC are collectively referred to as "Amneal".

82.     Amneal manufactures, promotes, markets, distributes and sells opioids in Plaintiff's geographical area and throughout the nation.

83.     At all times relevant, Amneal manufactured, marketed, and sold opioids, including generic oxycodone and hydrocodone, throughout the United States and Plaintiff's geographic area. Amneal manufactured, marketed, and sold opioids throughout Plaintiff's geographic area, in violation of the duties owed to Plaintiff in sufficient quantities to be a proximate cause of Plaintiff's injuries.

84.     As a generic manufacturer, Amneal failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users. Amneal could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Amneal had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Amneal

21

failed to report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur. See 21 C.F.R. § 1301.71(a).

### 6. KVK-Tech

85.     Defendant KVK-Tech, Inc. is a privately-held Pennsylvania corporation with its principal place of business in Pennsylvania. KVK-Tech, Inc.is a manufacturer of generic prescription opioids, including many Schedule II controlled substances such as Oxycodone and Hydrocodone. KVK-Tech, Inc. manufactures, markets, sells and/or distributes pharmaceutical drugs nationally and in Plaintiff's' geographic area. KVK-Tech, Inc. is registered to conduct business and/or conducts business in Plaintiff's geographic areas as a licensed wholesale pharmaceutical manufacturer.

### 7. Indivior

86.     Defendant Indivior Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc. ("Indivior") is a Delaware corporation with its principal place of business located at 10710 Midlothian Turnpike, Suite 430, Richmond, Virginia 23235.

87.     At all times relevant to this Complaint, Indivior Inc. manufactured, marketed, sold, and distributed prescription opioids nationally, including in Plaintiff's' geographic area, including many opioid medications such as Sublocade (buprenorphine), Subutex tablet (buprenorphine), Suboxone tablet (buprenorphine/naloxone), and Suboxone film (buprenorphine/naloxone).

88.     In April 2019, the U.S. Department of Justice announced that Indivior Inc. was indicted for fraudulently marketing their Suboxone film opioid as safer, less divertible, and less abusable than other opioid-addiction treatment drugs. Indivior was alleged to have sought to boost profits by using a "Here to Help" program to connect opioid-addicted patients to doctors the company knew were prescribing opioids at high rates and in a clinically unwarranted manner.

22

89.     According to the indictment, Indivior promoted the film version of Suboxone (Suboxone film) to physicians, pharmacists, Medicaid administrators, and others across the country as less-divertible and less-abusable and safer around children, families, and communities that other buprenorphine drugs, even though such claims have never been established.

90.     The indictment also alleges that, to further its scheme, Indivior announced a "discontinuance" of its tablet form of Suboxone based on supposed "concerns regarding pediatric exposure" to tablets, despite Indivior executives' knowledge that the primary reason for the discontinuance was to delay the Food and Drug Administration's approval of generic tablet forms of the drug.

91.     In July 2019, the U.S. Department of Justice and Indivior negotiated a $1.4 billion settlement of the issues presented by the indictment.

92.     Indivior Solutions, a subsidiary of Indivior Inc., was sentenced to pay $289 million in criminal penalties in connection with a previous guilty plea related to the marketing of the opioid-addiction treatment drug Suboxone. Together with Indivior's civil penalties, it will pay $600 million to resolve its civil and criminal liability.

93.     Altogether, the investigation and prosecution of Indivior Solutions and its parent companies, Indivior Inc. and Indivior plc, and two former Indivior executives (its CEO and Medical Director) and a resolution with Indivior's former parent, Reckitt Benckiser Group plc, resulted in recoveries of more than $2 billion.

94.     Indivior Solutions pleaded guilty on July 24, 2020, to a one-count felony criminal information charging false statements relating to health care matters. Indivior Inc. agreed to terms complementing the Indivior Solutions guilty plea and agreed to implement prospective measures that include permanently disbanding Indivior Inc.'s Suboxone sales force and taking steps to prevent promoting Suboxone to health care providers at a high risk of inappropriate prescribing.

23

### 8. <u>Assertio</u>

95.    Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. ("Assertio" or "Depomed") is a Delaware corporation with its principal place of business in Lake Forrest, Illinois. Depomed acquired Nucynta (tapentadol immediate-release oral tablets) and Nucynta ER (tapentadol extended-release tablets) from J&J in April of 2015 and began to manufacture, market, sell and distribute Nucynta® in the U.S., including in Plaintiff's geographic areas. Depomed also manufactures, markets, sells and distributes Lazanda (fentanyl).

96.    On information and belief, Depomed entered a Commercialization Agreement with Collegium Pharmaceutical, Inc. (Collegium) in January of 2018 that granted Collegium the right to commercialize Nucynta and Nucynta ER in the U.S. Collegium assumed all commercialization responsibilities for Nucynta effective January 9, 2018, including sales and marketing. Pursuant to the Commercialization Agreement, Depomed will receive a royalty on all Nucynta and Nucynta ER revenues based on certain net sales thresholds, with a minimum royalty of $135 million per year during the first four years of the agreement. Additionally, Depomed retained certain rights to co-promote Nucynta products.

97.    Depomed actively promoted and continues to promote the sale and use of its opioid products throughout the U.S., including in Texas and Plaintiff's geographic areas. In 2015, Depomed paid over $2.11 million to physicians and hospitals across the U.S., including in the State of Texas, to promote widespread prescribing, sales and use of Nucynta and Nucynta ER. On information and belief, from 2013 through 2015, Depomed paid $1.07 million to physicians and hospitals across the U.S., including in the State of Texas, to the promote the sale and use of Lazanda. Additionally, from 2012 to 2017, Depomed paid $1,071,000 to non-profit patient advocacy groups and medical societies to promote opioid prescribing and enhance the acceptance of opioids for non-cancer pain. Specifically, Depomed made payments to several industry front

24

Case 7:23-cv-06103-CS   Document 1-1   Filed 07/15/23   Page 39 of 41

groups, including the Academy of Integrative Pain Management ($43,491.95), American Academy of Pain Medicine ($332,100.00), AAPM Foundation ($304,605.00), American Chronic Pain Association ($54,670.00), American Pain Society ($288,750.00), American Society of Pain Management Nursing ($25,500.00), and U.S. Pain Foundation ($22,000.00).

98.     Depomed established a training module called the "Depomed Pain Medicine Education Program" with the American Academy of Pain Medicine, which can be found at the American Academy of Pain Medicine (AAPM) Education Center. The training module appears on the AAPM webpage and "was designed to further sales specialists' knowledge of the fundamentals of pain medicine and gain confidence and credibility when interacting with health care clinicians." The Pain Medicine Education Program promotes use of opioids for chronic pain in older adults and has modules entitled: "Strategies for Success with Chronic Opioid Therapy," "Pain Management with Older Adults," and "Pain and Pathways: Understanding Chronic Low Back Pain."

**9.  Abbott**

99.     Abbott Laboratories, Inc. is a domestic BCA organized under the laws of Illinois. Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois, and Abbott Laboratories, Inc. is a Illinois corporation with its principal place of business in Abbott Park, Illinois (collectively, "Abbott").

100.     Abbott was primarily engaged in the promotion, and distribution of opioids nationally, in Plaintiff's geographic area, due to a co-promotional agreement with Defendant Purdue. Pursuant to that agreement between 1996 and 2006, Abbott actively promoted, marketed and distributed Purdue's opioid products.

101.     With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.6 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.

25

102.    Abbott, as part of the co-promotional agreement, helped make OxyContin into the largest-selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received 25 to 30 percent of all net sales for prescriptions written by doctors its sales force called on. This agreement was in operation from 1996 to 2002, following which Abbott continued to receive a residual payment of 6 percent of net sales up through at least 2006.

103.    Abbott heavily incentivized its sales staff to push OxyContin, offering $20,000 cash prizes and luxury vacations to top performers. The company used Middle Age Crusade terminology: Sales reps were called "Crusaders" in the "Royal Court of OxyContin," executives referred to in memos as the "Wizard of OxyContin", "Supreme Sovereign of Pain Management" and the "Empress of Analgesia". The head of pain care sales, Jerry Eichorn, was the "King of Pain" and signed memos simply "King."

104.    In one particular memo to Sales Reps, two Abbott Reps were received high accolades from "The Kingdom of Abbott Pain Management" for a "particularly outstanding Crusader success story."

105.    In this same memo, the "Empress of Analgesia" pushed Sales Reps to hone their focus on 50 key surgeons and anesthesiologists, more specifically to "target those who have the potential to widely prescribe OxyContin and Vicoprofen on a consistent basis each month." The "King of Pain" encouraged sales representatives to use emotion in their sales tactics, and then supplied examples, both based on vague science:

> Did Doctor X have disruptive callbacks from Patient Y today, unhappy with his bread-through pain levels on Percocet? Explain how OxyContin smooth, sustained blood level throughout 12 hours should alleviate this problem by keeping patients comfortable. Is Surgeon A concerned about the euphoria Patient B is experiencing from Vicodin? Tell your doctor that, with its longer half life, OxyContin has fewer such effects.

26

106. Abbott and Purdue sales representatives wooed doctors with food, gifts, and influence peddling, techniques which netted them both a huge portion of profits from opioid sales in Plaintiff's geographic area, and nationwide. The sales forces of Abbott and Purdue worked in tandem, holding regular strategy sessions.

### 10. Sun Pharmaceutical

107. Defendant Sun Pharmaceuticals is a wholly owned subsidiary of Sun Pharmaceutical Industries Ltd. It manufactures, markets, and distributes drugs, including opioids, in the United States, including in Plaintiff's geographic area.

### 11. Zydus

108. Defendant Zydus Pharmaceuticals (USA) Inc. is a company located in New Jersey.

109. At all relevant times, Zydus manufactured, marketed, and sold generic opioids throughout the United States and Plaintiff's geographic area. Zydus manufactured, marketed, and sold opioids throughout Plaintiff's geographic area, in violation of the duties owed to Plaintiff in sufficient quantities to be a proximate cause of Plaintiff's injuries.

110. As a generic manufacturer, Zydus failed to effectively and adequately communicate warnings in the labels of their products to prescribers and users. Zydus could have communicated the risks associated with the use of prescription opioid drugs through dear doctor or healthcare provider letters. However, Zydus had a financial incentive not to communicate these warning and risks and aggressively marketed its generic opioid products to drug distributors, prescription benefit managers, formularies, insurance companies, and other third parties to increase its own generic market share. Moreover, in the manufacture and sale of its opioid products, Zydus failed to report suspicious orders in violation of its duties under the Controlled Substances Act and local law and knowingly allowed widespread diversion to occur. See 21 C.F.R. § 1301.71(a).

### 12. Associated Pharmacies

27